UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NAPOLEON PAYNE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 1233 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CARYLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Napoleon Payne brought this action for judicial review of the Commissioner's denial of his application for Supplemental Security Income and Disability Insurance Benefits.[1] Payne claims that he suffers from chronic pain in his wrists, leaving him unable to work and therefore eligible for disability benefits under the Social Security Act, 42 U.S.C. § 423. R. 1, Compl.[2] The issue in this case is whether the Administrative Law Judge correctly established the onset date of Payne's disability. Payne avers that he became disabled on June 1, 2006, but the Administrative Law Judge found that Payne did not become disabled until April 26, 2011. So Payne filed this motion to reverse and remand the Administrative Law Judge's decision, arguing that the Administrative Law Judge failed to follow the Commissioner's

---

[1]This Court has subject matter jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

[2]Citations to the docket are indicated by "R." followed by the docket entry and, when necessary, a page or paragraph number.

regulations and rulings, thereby committing an error of law. For the reasons set forth below, Payne's motion is granted and the matter is remanded for further proceedings.

## I. Background

Payne first applied for disability benefits on January 3, 2009. R. 10, Administrative Record ("AR") at 33. In his application, he alleged a disability onset date of June 1, 2006.[3] *Id.* at 33, 176, 187. Payne's application initially was denied on January 26, 2010, and denied again on reconsideration on May 17, 2010. *Id.* at 33. He then requested a hearing in front of an Administrative Law Judge, which was held on March 8, 2012. *Id.* Following the hearing, the Administrative Law Judge issued an opinion establishing Payne's disability onset date as April 26, 2011 and granting Payne's application for benefits after that date, but denying his request for benefits before that date.[4] *Id.* at 33-40. The Appeals Council declined Payne's request for review on July 31, 2013, rendering the Administrative Law Judge's ruling the final decision of the Commissioner. *Id.* at 1; *see Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). Payne filed his Complaint with this Court in

---

[3]The Administrative Record contains various alleged onset dates. *See* AR at 48, 107, 183-84, 218, 222. But because the Administrative Judge's Decision and the parties' briefings all refer to June 1, 2006 as Payne's alleged onset date, the Court will use that date in this Opinion.

[4]In order to be eligible for Disability Insurance Benefits, Payne must show that he became disabled before his insured status expired. *See* 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. § 404.320(b)(2); *Shideler v. Astrue,* 688 F.3d 308, 311 (7th Cir. 2012). Because Payne's last insured date was December 31, 2010 and the Administrative Law Judge found that he was not disabled until April 2011, Payne is not eligible for Disability Insurance Benefits under the Administrative Law Judge's ruling. *See* AR at 33, 187.

February 2014, seeking review of the Administrative Law Judge's decision. *See* Compl.

## A. Factual Background

The Administrative Record supplies the factual background of this case. At the time of his hearing in front of the Administrative Law Judge, Payne was 50 years old and had some high school education.[5] AR at 71, 100, 176, 227. From 1986 to 1987, Payne worked as a bus driver.[6] *Id.* at 223. After that, Payne started working as a cable television installer in 1989, a job that frequently required him to climb ladders and lift 25-pound weights. *Id.* at 242. In 1993, while on the job, Payne fell from a ladder, cracking his skull and breaking both of his arms. *Id.* at 247. He was hospitalized for several weeks and underwent reconstructive surgery on both wrists. *Id.* at 305. Payne continued to work as a cable installer until 1999,[7] and also started working as a delivery truck driver in 1997.[8] *Id.* at 223. His duties as a truck driver included restocking food products inside a trailer and unloading the products off of the truck. *Id.* at 224. Sometime in 2005 or 2006, Payne's employer "let [him]

---

[5]There is some uncertainty as to whether Payne completed high school. Form SSA-3368 states that Payne earned his GED in 1987. AR at 227. But, at the hearing, Payne testified that he had not earned his GED. *Id.* at 71. And the consultative examiner noted that Payne had a ninth-grade education, while the psychological consultant recorded Payne's education level as twelve. *Id.* at 306, 332.

[6]While Form SSA-3368 states that Payne held this job, AR at 223, it is not reflected in the Work History Report Payne completed in October 2009, *id.* at 240.

[7]Payne stated in the Work History Report that he left this job in 1993, AR at 240, but Form SSA-3368 states that he held it until 1999, *id.* at 223.

[8]**Error! Main Document Only.**Form SSA-3368 states that Payne also worked as a truck driver from January 1991 to December 1992 and a forklift operator for a month in 2006. AR at 223. The Work History Report, however, notes that Payne worked as a truck driver from September 1996 to July 2006. *Id.* at 240.

go because [he] couldn't perform the duties" anymore. *Id.* at 71-72. Payne has been unemployed since then.

Payne claims that he became disabled on June 1, 2006 because, as of that date, the pain and impairment caused by the bilateral arthrodesis[9] of his wrists rendered him unable to work. AR at 35. But because of the scarcity of his medical records before 2011, there is no documentation of exactly what medical impairments he had on this date.[10] Payne does provide notes from a visit to Dr. Antony George in September 2009.[11] *Id.* at 297-302. Although the purpose of the visit was to address Payne's complaints of headache-related pain, Dr. George noted that Payne also suffered from "chronic wrist pain." *Id.* at 300. The Administrative Record also states that Payne was treated at Oak Park Medical in January and March 2010, but the Record does not contain treatment notes from either of those visits. *Id.* at 256. In the Record, Payne claims that he was treated by Drs. Hegde and Vest from 2010 to 2012 and Dr. Sarpy from 2011 to 2012. *Id.* at 283.

In November 2009, Payne underwent a consultative examination with Dr. Anand Lal in connection with his application for disability benefits. AR at 305-14. In his post-examination report, Dr. Lal stated that Payne had "atrophy of the wrist muscles," limitations in flexion and extension in both wrists, and moderate to severe

---

[9]Arthrodesis is "the surgical fixation of a joint by a procedure designed to accomplish fusion of the joint surfaces by promoting the proliferation of bone cells." *Dorland's Illustrated Medical Dictionary* 157 (32d ed. Elsevier Saunders 2012).

[10]While Payne's medical records and the Administrative Law Judge's decision include information about his mental health, this Opinion does not address that topic in detail because it is not at issue in this review.

[11]Payne stated that he saw Dr. George in October 2009, AR at 237, but Dr. George's notes are dated September 12, 2009, *id.* at 297-302.

difficulty gripping and squeezing. *Id.* at 309, 312. At the examination, Payne also reported headaches and poor vision, which he was doing little to treat due to his inability to afford glasses or pain medication. *Id.* at 305. Dr. Lal recorded that Payne had stuttered for most of his life, but his speech at the time of the examination was normal. *Id.* at 313. Dr. Lal concluded that Payne's condition consisted of: restriction in the range of motion of both wrists; partial atrophy and chronic pain in both wrists; impaired vision; post-traumatic cephalalgia[12]; history of depression; peripheral arterial disease; stuttering; and history of headaches. *Id.* at 314.

Payne also underwent a psychiatric examination as part of his claim for disability benefits. He saw Dr. Ana Gil in December 2009. AR at 315-19. Dr. Gil concluded that Payne had moderately severe depressive disorder and noted that he stuttered when he spoke. *Id.* at 318-19.

State agency physician Dr. Young-ja Kim completed a Physical Residual Function Capacity Assessment of Payne in January 2010. AR at 334-41. The assessment noted that Payne could frequently lift and/or carry ten pounds; occasionally lift and/or carry twenty pounds; sit, stand, or walk about six hours in an eight-hour workday; and push or pull without limitation. *Id.* at 335. According to Dr. Kim's assessment, Payne could occasionally climb stairs, stoop, kneel, crouch crawl, and balance, but could never climb ladders, ropes, or scaffolds. *Id.* at 336. He also had difficulty with gross and fine manipulation. *Id.* at 337. Finally, Dr. Kim

---

[12] Cephalalgia is a headache. *Dorland's*, *supra* note 9, at 330.

recorded that Payne had limited ability to see faraway objects but did not have communicative limitations. *Id.* at 337-38.

In April 2011, Payne was found to have an "acute fracture in the distal left ulna" (that is, a fracture in his forearm, closer to the wrist than the elbow). AR at 346. When Payne visited Dr. Dinraj Hegde in May 2011, the doctor recorded that Payne had a fractured forearm and chronic pain syndrome but the pain was not affecting Payne's activity level. *Id.* at 371-72. Payne had follow-up appointments in May and June 2011 for his fracture. *Id.* at 345-46.

Payne's next examination was with Dr. Vest in October 2011. AR at 363-68. His chief complaint was "pain in both legs and hands," which he rated an 8 out of 10. AR at 363. After the examination, Dr. Vest completed a Headache and Chronic Pain Residual Functional Capacity Questionnaire. *Id.* at 409-20. The questionnaire stated that Payne had headaches roughly three times per week, with each headache lasting 30 to 45 minutes. *Id.* at 409. In addition, Payne suffered from constant wrist pain that affected his ability to concentrate. *Id.* at 413. The questionnaire further noted that, although Payne was physically capable of working low-stress jobs, he could only sit, stand, or walk for 45 minutes at a time before he would need to change position. *Id.* at 414. Even then, Payne would need a ten-minute unscheduled break each hour, could never carry any object more than ten pounds, and could only rarely carry objects less than ten pounds. *Id.* at 415-16. Plus he would have to take three unscheduled 30-minute breaks each week and would likely miss work at least four times per month. *Id.* at 411-12.

In making his decision, the Administrative Law Judge relied on statements and testimony from Payne and two experts—Dr. Ashok Jilhewar, the medical expert, and Glee Ann Kehr, the vocational expert—in addition to the medical records described above. In the Administrative Record and at the hearing, Payne described his physical condition and its effects on his daily life. He stated that, starting in 2006, he began having problems with pain and arthritis. AR at 247. He could stand and walk, but had to sit down again after half an hour. *Id.* at 80. Payne could lift only a couple of pounds—he could not lift a gallon of milk or a case of soda pop—and, even then, frequently dropped things. *Id.* at 80, 88. These physical limitations impacted his ability to go about his day-to-day life. Arthritis prevented him from preparing food or doing household chores, and impeded his ability to dress, bathe, and feed himself. *Id.* at 231, 233-34. Poor eyesight kept him from reading. *Id.* at 78-79. Payne reported that his day consisted of brushing his teeth, washing his face, watching television until his "eyes [went] blurry," and laying down. *Id.* at 229. In order to manage his pain, Payne took a number of medications, including Motrin, Tylonel, Baclofen, Tramadol, Risperdone, Diphenhydramine, Ibuprofen, and Wellbutrin. *Id.* at 226, 268, 284, 423-25, 361.

Dr. Jilhewar, the medical expert, testified at the March 2012 hearing. He consulted Payne's medical record, but did not examine Payne himself. AR at 51. Dr. Jilhewar noted that the first documentation of a severe impairment in the record was the report from Dr. Lal's consultative examination in November 2009. *Id.* at 52. Dr. Jilhewar summarized Payne's condition as "[a]rthrodesis of both wrists,

sometime in 1993, by a self-report, resulting in significant degrees in a range of movement of both wrists, and degrees in grip strength … and absence of specific management of the problem in the medical records." *Id.* at 54. Although the doctor noted that Payne had complained of headaches since 1993, Dr. Jilhewar testified that the medical record did not contain any specific information on the management of headaches, with the exception of an Emergency Room visit in September 2011 that resulted in a normal CT scan. *Id.* at 55. Nor did the medical record contain any information on the management of chronic pain, pain consultation, or the prescription of narcotics on a consistent basis, thus precluding Dr. Jilhewar from testifying that Payne suffered from chronic pain. *Id.* at 57. Dr. Jilhewar concluded that Payne could perform light physical work, but would only be able to handle objects occasionally. *Id.* at 59.

Kehr, the vocational expert, also testified at the hearing. Kehr classified Payne's previous job as a truck driver as semi-skilled work with moderate physical demand. AR at 90-97. The Administrative Law Judge then posed three hypotheticals, which required Kehr to identify the types of jobs that a hypothetical person with the limitations described by the Administrative Law Judge would be able to perform. *Id.* In the first hypothetical, the Administrative Law Judge asked about the jobs available to a person of Payne's age, education, and work experience, with the following abilities and limitations: able to lift up to twenty pounds occasionally; able to lift or carry up to ten pounds frequently; able to stand or walk six hours in an eight-hour workday; able to sit eight hours in an eight-hour

workday; able to take normal breaks; unable to climb ladders, ropes, or scaffolds; unable to crawl, but able to crouch and kneel; able to perform fine manipulations frequently but gross manipulations only infrequently; and unable to work in a profession requiring frequent verbal communications. *Id.* at 91-92. Kehr responded that such a person would not be able to work as a truck driver (which was Payne's previous job), nor could he work in *any* other position, because there were no occupations that did not require either frequent verbal communication or frequent gross manipulation. *Id.* at 92.

In the second hypothetical, the Administrative Law Judge asked Kehr to assume the same facts and limitations as the first hypothetical, but strike the limitation on verbal communication. AR at 92-93. Kehr testified a person with such traits could work as an usher, a counter clerk, or as a rental clerk. *Id.* at 93. All three occupations were available in the Chicago metropolitan area and were classified as light and unskilled work. *Id.*

Finally, the Administrative Law Judge asked Kehr to assume the same facts and limitations of the second hypothetical, except that the person's work would be limited to simple, routine, repetitive tasks with only occasional interaction with the public and co-workers. AR at 95. Kehr testified that such a person would be precluded from working. *Id.*

## B. The Disability Determination Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The test requires the Commissioner to consider: (1) whether the claimant has performed any substantially gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether he is able to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter,* 245 F.3d 881, 885 (7th Cir. 2001).

If the answer to steps one or two is "no"—that is, the claimant performed substantially gainful activity and/or lacks a severe impairment—the Commissioner will reach a finding of "not disabled." *See Zurawski*, 245 F.3d at 886. Otherwise, the Commissioner moves on to step three. If step three is answered in the affirmative, and the claimant's impairment is listed as one that precludes substantial gainful activity per se, then the claimant is found to be disabled. *Id.* If not, the

Commissioner must determine the claimant's residual functional capacity—that is, the sort of work that the claimant can still perform given his impairment(s)—and assess whether that capacity allows the claimant to perform either his past work (step four) or any other work existing in significant numbers in the national economy (step five). *Id.* If it does not, then the claimant is disabled. *Id.* The claimant bears the burden of proof at steps one through four. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. After that, it is up to the Commissioner to establish that the claimant is capable of performing work that exists in significant numbers in the national economy. *Zurawski*, 245 F.3d at 886.

## C. The Administrative Law Judge's Decision

In his decision, the Administrative Law Judge walked through the five-step process. First, he found that Payne had not engaged in any substantially gainful activity since June 1, 2006, his alleged onset date of disability. AR at 35. At step two, the Judge concluded that, as of the alleged onset date, Payne did have a severe impairment in the form of bilateral arthrodesis of his wrists, post trauma. *Id.* And since April 26, 2011, Payne had the additional impairment of an acute fracture of the distal left ulna. *Id.* Moving on to step three, the Judge consulted 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02(B)—which governs the evaluation of a claimant's ability to perform fine and gross movements with the upper extremities—and concluded that Payne did not "manifest clinical signs and findings that meet the specific criteria of any of the Listings" that would conclusively render a finding of

disabled. *Id.* at 36. This conclusion was supported by the opinions of the state agency medical consultants and the testifying medical expert. *Id.*

At step four of the evaluation, the Administrative Law Judge determined Payne's residual functional capacity on the alleged onset date. He concluded that, on June 1, 2006, Payne could perform light work as defined in 20 C.F.R. § 416.967(b), with the caveat that he could never climb ladders, ropes, or scaffolds and could not crawl. AR at 36. And although Payne could frequently perform fine manipulations (that is., manipulate with his fingers), he could only occasionally perform gross manipulations (that is, handle objects). *Id.* In reaching this determination, the Judge considered Payne's statements regarding his symptoms and concluded that, although Payne's medical impairments could reasonably be expected to produce the alleged symptoms, his statements concerning the "intensity, persistence, and limiting effects of those symptoms [were] not credible prior to April 26, 2011 to the extent they [were] inconsistent with the residual functional capacity assessment." *Id.* at 37.

The Administrative Law Judge also determined, based on Dr. Vest's residual functional capacity questionnaire, that beginning on April 26, 2011 (when Payne fractured his left wrist) Payne could still perform sedentary work but would likely miss more than four days of work per month,. AR at 38. Payne's allegations regarding his symptoms and limitations were found to be "generally credible" from this date forward. *Id.* The Judge gave Dr. Vest's questionnaire significant weight in determining Payne's residual functional capacity from April 2011 on. *Id.*

Based on these residual functional capacity determinations, the Administrative Law Judge found Payne unable to perform his past relevant work as a truck driver as of the alleged onset date in June 2006. AR at 38. The evaluation then proceeded to step five to determine whether Payne could perform other available work. Remember that at this stage, the burden of proof shifts to the government to establish that there were significant numbers of jobs in the national economy that Payne would be able to do. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. The Judge decided that Payne could not be conclusively deemed "disabled" or "not disabled" under Medical-Vocational Rule 202.21[13] because, although he had the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b), he had additional limitations (such as the inability to climb ladders, ropes, and scaffolds or to crawl, and the inability to handle objects frequently) and could not perform the full range of light work. Because of these additional limitations, the Judge asked Kehr, the vocational expert, "whether jobs exist[ed] in the national economy for an individual with [Payne's] age, education, work experience and residual functional capacity." AR at 39. The Judge determined, based on Kehr's testimony, that Payne could work as an usher, counter clerk, or rental clerk. *Id.* Hence Payne was not disabled in June 2006.

But the Administrative Law Judge found that Payne *became* disabled on April 26, 2011. AR at 40. Again, because Payne could not perform the full range of

---

[13]Because of the uncertainty as to whether Payne completed high school, *see* AR at 71, 221, 306, 332; *supra* note 5, the Administrative Law Judge should have applied Medical Vocational Rule 202.18, which pertains to individuals with limited education, *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 2. But this mistake had no effect on the final outcome.

sedentary work, he could not be found disabled or not disabled under the Medical-Vocational Rules.[14] *Id.* So taking into account Payne's additional limitations as of April 2011—the fact that he would likely have to take more than four days off of work per month—and Kehr's testimony that such limitations would render Payne unemployable,[15] the Judge concluded that Payne was disabled as of April 26, 2011. *Id.* The Judge's decision thus refers to this date as the "established onset date" of disability.

## II. Standard of Review

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). The Appeals Council's decision to not review an Administrative Law Judge's ruling constitutes a final decision of the Commissioner. *Villano*, 556 F.3d at 561-62. A decision must be reversed if the Commissioner committed an error of law or if the record as a whole does not contain substantial evidence to support the Commissioner's findings. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). If there is an error of law, reversal is warranted, regardless of how much evidence supports the final determination. *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir. 1980). A decision contains an error of law

---

[14]Again, the Administrative Law Judge applied the incorrect Medical-Vocational Rule in his decision by applying Medical-Vocational Rule 201.28, *see* AR at 40, which governs high-school graduates, when it is uncertain whether Payne completed high school, *see supra* note 5.

[15]The Court notes that the Administrative Law Judge never actually fashioned a hypothetical about a person performing sedentary work, though he claims to have done so in his decision. *See* AR at 40. Instead, the Judge asked Kehr two hypotheticals about a person's ability to work at the light level, and one about a person's ability to perform only "simple, routine, and repetitive tasks." *Id.* at 91-95.

when it fails to comply with the Commissioner's regulations. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (reversing decision that did not comply with regulation concerning weight given to treating physician).

While this Court reviews the Administrative Law Judge's legal decisions *de novo*, the Judge's factual determinations are granted deference and affirmed so long as they are supported by substantial evidence on the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Evidence is substantial if a reasonable person would accept it as adequate to support the Judge's decision. *Id.* at 1160. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the Administrative Law Judge must consider all relevant evidence and may not select and discuss only the evidence that favors his ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the Judge is not required to discuss every piece of evidence in the record, he must provide in his decision an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the ultimate findings and afford the claimant meaningful judicial review. *Jones,* 623 F.3d at 1160. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

### III. Analysis

Payne argues that the correct onset date of disability is not April 26, 2011, when Payne fractured his wrist, but June 1, 2006, when his chronic pain and limited movement caused him to lose his job as a truck driver and made him unable to find other work. Payne contends that the Administrative Law Judge erred when he: (1) did not properly evaluate the intensity and persistence of Payne's symptoms or their effects on work-related activities; (2) failed to prove that there were a significant number of jobs that Payne could perform due to his inadequate consideration of Payne's visual and communicative limitations; and (3) did not properly consider the opinion of one of Payne's treating physicians, Dr. Vest, in concluding that Payne was not disabled before April 26, 2011. *See* R. 15, Pl.'s Br. The Commissioner opposes Payne's arguments and asserts that, because substantial evidence supports the Administrative Law Judge's decision, the decision should be affirmed. *See* R. 19, Def.'s Resp. Br.

### A. Intensity and Persistence of Payne's Symptoms

While the parties' briefings addressed the conformity of the Administrative Law Judge's decision-making with Social Security Ruling (SSR) 96-7p, the Court will analyze the Judge's decision against SSR 16-3p, which superseded SSR 96-7p.[16]

---

[16]Though SSR 16-3p was released after the Administrative Law Judge's decision and after the parties submitted their briefing materials for this Court's review, this decision will apply SSR 16-3p retroactively because SSR 16-3p purports to clarify its predecessor SSR 96-7p rather than effect a change in law. *See* SSR 16-3p (stating that the changes in SSR 16-3p are intended to "clarify that subjective symptom evaluation is not an examination of an individual's character" and "more closely follow [the Social Security Administration's]

SSR 16-3p requires that the Administrative Law Judge follow a two-step process to evaluate a claimant's subjective symptoms: first, he must "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain"; and second, he must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities … ." In the present case, the Administrative Law Judge decided the first step in the affirmative, and the parties do not disagree. What the parties dispute is whether the Judge properly considered the second step.

When evaluating the intensity and persistence of the claimant's symptoms, the Administrative Law Judge may not base his determination "solely on objective medical evidence unless that … evidence supports a finding that the individual is disabled." SSR 16-3p. The Judge must also examine the claimant's statements and "evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* Importantly, the Judge must "*explain* which of an individual's symptoms [he] found consistent or inconsistent with the evidence in his or her record and how [the Judge's] evaluation of the individual's symptoms led to [his] conclusions." *Id.* (emphasis added). If the claimant's statements on his or her

regulatory language regarding symptom evaluation."). Case law concerning former SSR 96-7p remains binding, however. *See Farrar v. Colvin*, 2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016). This practice is consistent with other courts in this District. *See, e.g., id.*; *McCammond v. Colvin*, 2016 WL 3595736, at *2-3 (N.D. Ill. July 5, 2016); *Hagberg v. Colvin*, 2016 WL 1660493, at *6 (N.D. Ill. Apr. 27, 2016).

symptoms are consistent with the objective medical evidence, then it is more likely that symptoms will be found to reduce the claimant's capacity to work. *Id.*

The Administrative Law Judge found that Payne's "statements concerning the intensity, persistence and limiting effects of his symptoms [were] not credible prior to April 26, 2011, to the extent that they [were] inconsistent with the residual functional capacity assessment." AR at 37. But this flips the order of the analysis. Instead of *explaining* which of Payne's symptoms he found consistent with the medical evidence, and then factoring the consistent symptoms into his residual functional capacity assessment—as the regulations require—the Administrative Law Judge seemingly arrived at a residual functional capacity assessment first and then discredited any symptoms that contradicted that assessment. *Cf. Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (emphasizing that language implying that "the ability to work is determined first and is then used to determine the claimant's credibility" "gets things backwards"). Indeed, the Seventh Circuit has criticized the language quoted from the Administrative Law Judge's decision as "meaningless boilerplate" because it "fails to specify which statements are not credible." *Id.* at 645.

Notably, the Administrative Law Judge does not even address many of Payne's alleged symptoms, much less explain whether the Judge found them consistent with the medical evidence. The decision mentions that Payne "complained of increasing difficulty using his hands as he gets older, and chronic pain especially in cold, or wet environments," but neither discounts nor credits

these statements. *See* AR at 37. Nor does the decision discuss the consistency or effect of Payne's testimony that he "couldn't lift" objects at his last job in 2006, that he has been in constant pain "for a number of years," that he cannot do housework or yard work, that he can only lift "a couple of pounds," and that he has "chronic headaches." *See id.* at 73-74, 80-81, 84, 86, 87-88). By not addressing this testimony or explaining why he discounted it, the Administrative Law Judge failed to build a logical bridge between the evidence and his conclusion that Payne's testimony about his daily activities, level of pain, and limitations was not credible, as is required by 20 C.F.R. § 404.1529(c) and SSR 16-3p. *See Jones,* 623 F.3d at 1160. So a remand is required.

## B. Visual and Communicative Limitations

Next, Payne argues that, at step five of the evaluation, the Administrative Law Judge failed to ask Kehr a hypothetical incorporating all of Payne's documented limitations in 2006 and ignored favorable testimony from Kehr on Payne's inability to do light work. Pl.'s Br. at 12-15. As a result of these errors, the Judge found that there was a significant number of jobs that Payne could perform before April 2011 when in fact there was not.

First, Payne complains that the Administrative Law Judge did not pose a hypothetical incorporating his visual impairments. Pl.'s Br. at 13-14. The Seventh Circuit has held that "the most effective way to ensure that the [vocational expert] is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Both

Drs. Lal and Kim noted that Payne had cataracts and impaired vision, so there is evidence of this limitation in the record. AR at 305-06, 314, 337, 341. But the Administrative Law Judge did not incorporate visual impairment in any of the hypotheticals he posed to Kehr. The Commissioner argues that, though it is unclear when Payne's visual limitations began, he attributed the problem to his skull fracture in 1993 but continued to work as a truck driver for several years afterward, which calls the credibility of those limitations into question. Def.'s Br. at 5-6. That evidence might very well be a solid basis to reject the existence of the visual limitations, but the Administrative Law Judge's decision did not make a finding on the visual limitations one way or the other, so the Court cannot consider this explanation, newly offered by the government in this litigation. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87-88 (1943). So either the Administrative Law Judge should have made an explicit finding rejecting the existence of a visual impairment (and explained why he was rejecting it) or the Judge should have included it in the hypothetical.

The absence of the impairment from the hypothetical is a problem because the purpose of a hypothetical is, of course, to incorporate all of a claimant's limitations so that the expert can offer an informed opinion. To be sure, reviewing courts sometimes infer, given the surrounding circumstances, that the vocational expert is familiar with the claimant's limitations despite gaps in the hypothetical, but that assumption is not appropriate here. *O'Connor-Spinner*, 627 F.3d at 619. Here, the Administrative Law Judge asked Kehr whether she was "familiar with

[Payne's] vocational background," not his *medical* background, and although Kehr heard the testimony at the hearing, the medical expert did not conclusively answer Payne's lawyer's questions about his blurred vision. AR at 61-62, 90. Because the hypothetical questions failed to include all of the limitations supported by medical evidence in the record, the Administrative Law Judge's conclusion that Payne can perform other work cannot be upheld. *Young v. Barnhart,* 362 F.3d 995, 1004-05 (7th Cir. 2004).

Payne also complains that the Administrative Law Judge did not factor Payne's stuttering into his determination that there was a sufficient number of available jobs. Payne points to the Judge's failure to explain why his decision relied on the hypothetical that omitted communicative limitations—based on which Kehr concluded that Payne could perform other work—but discredited the two hypotheticals that incorporated communicative limitations, to which Kehr responded that there would be no jobs available to Payne. The Administrative Law Judge "may not simply select and discuss only that evidence which favors his ultimate conclusion. Rather, [his] decision must be based upon consideration of all the relevant evidence." *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir. 2000). Payne argues that the Administrative Law Judge improperly disregarded favorable testimony from Kehr concerning the number of jobs available to someone with Payne's physical limitations *and* his stutter.

The Commissioner responds that the Judge did consider Payne's stutter, Def.'s Br. at 4-5, but disregarded it because Payne had the stutter when working as

a truck driver, "and thus there is no evidence that the condition significantly limited his ability to work," AR at 36. But that assertion is refuted by the fact that the Administrative Law Judge incorporated communicative limitations in two of the three hypotheticals he posed to Kehr, suggesting that he recognized Payne's stuttering as a potential problem. *See* AR at 91-95; *see also Thompkins v. Astrue*, 2010 WL 5071193, at *9 (N.D. Ill. Dec. 6, 2010). In *Thompkins,* the Administrative Law Judge incorporated the plaintiff's alleged need for breaks in a hypothetical to the vocational expert, but did not address that limitation in his decision. 2010 WL 5071193, at *9. The reviewing court concluded that "[b]y implication, the ALJ appears to have believed some evidence in the record justified asking" about the limitation but also thought the evidence was too insignificant to warrant mention in the decision. *Id.* But because the Judge did not discuss the reason for his silence, the reviewing court ordered a remand—as is required here. *See id.* To be sure, at a hearing, it is sensible for an Administrative Law Judge to pose hypotheticals with various limitations, because often the Judge has yet to decide which limitations actually exist. But when the Judge later issues a decision relying on one hypothetical and not the others, the Judge does have to explain why the others were rejected. The Administrative Law Judge's decision here does not do that.

And just because Payne's stuttering did not impair his ability to work as a truck driver does not mean that it would have no effect on his ability to engage in other occupations. In fact, Kehr testified at the hearing that jobs generally involve a trade-off between verbal communication and physical work. *See* AR at 92 ("[T]he

jobs that … allow for occasional … gross manipulation[] would be jobs where the individual would spend their time talking to other people."). So the fact that Payne's stuttering pre-dated his alleged disability does not by itself warrant the Administrative Law Judge's decision to discount the stutter. On remand, the Administrative Law Judge should explain why he relied on the hypothetical that did not incorporate the communicative limitations in determining that Payne could work at the light level before April 26, 2011.

## C. Dr. Vest's Opinion

Payne's final complaint is that the Administrative Law Judge did not properly analyze Dr. Vest's opinion because he did not discuss whether the opinion deserved controlling weight in the determination of benefits before April 2011. A treating physician's opinion is entitled to controlling weight if the physician's "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *See* 20 C.F.R. § 404.1527(c)(2). But just because the opinion is not entitled to controlling weight does not mean it may be discarded altogether. Instead, the Administrative Law Judge must treat the opinion with deference and weigh it using all of the factors provided in 20 C.F.R. § 404.1527 and § 416.927.[17] SSR 96-2p.

_____

[17]These factors include the "length, nature, and the extent of the treatment relationship, frequency of examination, the physician specialty, the types of tests

Unless the Administrative Law Judge performs this analysis, he commits legal error. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

But the Commissioner correctly points out that there is no evidence that Dr. Vest *was* a treating physician for Payne before April 2011. Def.'s Br. at 3. There are no medical records of visits between Payne and Dr. Vest before October 2011—when Payne saw Dr. Vest for his wrist fracture—despite Payne's self-report that she began treating him in 2010. AR at 283, 392, 422. And the Administrative Law Judge explicitly gave Dr. Vest's opinion "significant weight" in his decision to deem Payne disabled after April 2011. *Id.* at 38. In doing so, the Judge discussed some of the factors under 20 C.F.R. § 404.1527, such as supportability. So Dr. Vest's opinion is not directly relevant to Payne's pre-2011 eligibility. But because this case is already being remanded on other grounds, the Court directs the Administrative Law Judge to consider on remand whether explicitly analyzing the factors under 20 C.F.R § 404.1527(c), including the nature and length of the treatment relationship, would bolster his decision to disregard Dr. Vest's opinion as to Payne's condition before April 26, 2011.

---

performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

## IV. Conclusion

For the reasons discussed, the Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this Opinion.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: October 19, 2016